Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

IN THE CIRCUIT COURT FOR ST. LOUIS COUNTY
STATE OF MISSOURI

| | |
|---|---|
| CARLO ILARDI,<br><br>Plaintiff,<br><br>vs.<br><br>DEUTSCHE PRECISION, LLC,<br><br>Serve: Alfred J. Ludwig<br>Registered Agent<br>12935 North Outer Forty Drive<br>Suite 102<br>St. Louis, MO 63141-8653<br><br>JOHN HABE IV,<br><br>Serve: Metal Seal Precision, Ltd.<br>Attn: John Habe IV, President<br>8677 Tyler Blvd.<br>Mentor, OH 44060<br><br>and<br><br>BILL REEDER<br><br>Serve: 999 Oberlin Ave. SW<br>Massillon, OH 44647<br><br>Defendants. | Case No. 26SL-CC04781<br><br>Division |



Exhibit B

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

## PETITION

Carlo Ilardi, for his petition for damages for breach of contract, wage theft, penalty for unpaid wages on termination, defamation, and tortuous interference with a prospective business relationship against defendants Deutsche Precision, LLC, John Habe IV, and Bill Reeder, states:

### COUNT 1 – BREACH OF CONTRACT
### (Defendant Deutsch Precision, LLC only)

1. Plaintiff Carlo Ilardi is a resident of St. Louis County, Missouri.

2. Defendant Deutsche Precision, LLC ("DP"), is a Delaware limited liability company registered to do business in Missouri. DP's principal place of business is in St. Louis County, Missouri. This breach of contract count is alleged against defendant DP only.

3. Defendant John Habe IV is an Ohio resident, an owner (directly or indirectly) of DP, and the person in control of DP.

4. Habe is an owner (directly or indirectly) of Precision Metals Group ("PMG"), an industrial conglomerate, through which he exercises control over DP.

5. Defendant Bill Reeder is an Ohio resident and the chief operating officer of PMG. Reeder is also the *de facto* chief financial officer of DP.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

6. Ilardi helped start and establish DP's business and business operations in his capacity as an employee of Hydromat, Inc. Owners of Hydromat were founders and owners of DP. Those owners included Bruno Schmitter, Hydromat's chief executive officer.

7. Ilardi worked at DP at Schmitter's direction. Ilardi also worked for a related entity named Arch Precision.

8. Ilardi's responsibilities at DP increased to the point that Ilardi could no longer work for both DP and Hydromat. Ilardi ceased to be an employee of Hydromat and became president of DP. He also maintained responsibilities at Arch Precision.

9. Ilardi's compensation as president of DP was agreed to by Ilardi and Schmitter. Schmitter was acting on behalf of DP in making the agreement.

10. Ilardi's compensation as president of DP consisted of multiple components: (a) a monthly salary at a fixed amount (which amount increased over time); (b) a "13th month" salary payment, equal to Ilardi's monthly salary, paid in December of each year (effectively doubling Ilardi's wage for December each year); (c) an annual payment towards Ilardi's executive annuity; and (d) a non-discretionary bonus equal to an agreed

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

percentage of DP's Earnings Before Interest and Taxes ("EBIT"). This non-discretionary EBIT bonus, if earned, was paid to Ilardi in a lump sum in either January or February of the following year.

11. The EBIT figure used to calculated Ilardi's bonus was an adjusted EBIT in which any bonuses or distributions to DP's owners were added back in as part of EBIT for calculation of the bonus. "EBIT" as used in the petition is this adjusted EBIT.

12. In 2025, Ilardi's monthly salary was set at $17,300.

13. In 2025, DP's contribution to Ilardi's executive annuity was set at $8,200.

14. In 2025, Ilardi's EBIT bonus was to be 4% of EBIT.

15. Since Ilardi became DP's president, he received his nondiscretionary EBIT bonus annually. In 2023 and earlier, Ilardi's EBIT bonus was set at 2.5% of EBIT. In 2024, Ilardi's EBIT bonus was set at 3% of EBIT. DP increased Ilardi's bonus percentage to make up for reduced increases in his annual salary.

16. Ilardi did not receive an EBIT bonus in 2024 because DP did not have a positive EBIT that year. If DP's EBIT had been positive in 2024, Ilardi would have received a 3% EBIT bonus for that year.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

17. Ilardi understood that his EBIT bonus for 2025 was to be 4% of EBIT based on his discussions with Schmitter in 2023 and 2024 when they agreed that his EBIT bonus would increase in percentage annually for a period as his annual salary increases increased at a slower rate than in the past.

18. In the first half of 2025, Habe entered into negotiations to purchase DP and bring it under the PMG umbrella.

19. Habe also entered into negotiations with Ilardi to retain him as president of DP. These negotiations took place in June and July 2025.

20. In a June 19, 2025 email from Ilardi to Habe, Ilardi wrote:

> Subject: DP Discussion items
>
> John,
>
> As we approach the actual final close date, we have some topics to discuss. …
>
> 6. Lastly, we need to finalize my employment agreement moving forward. I am willing to work my way out of Arch Precision by the end of this year. To do this, I need to have an agreement put in place with PMG. I have put together a salary and bonus work-up on the attached spreadsheet that we can use to move forward. …

*Exhibit 1 at 2.*



Exhibit B

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

21. Habe responded that same day to item 6 on Ilardi's email: "I do not understand your spreadsheet. Can you put the total compensation you are requesting into one column per year with descriptions for each row?" *Exhibit 1 at 2.*

22. Ilardi provided Habe with the requested spreadsheet June 23, 2025. Ilardi's cover email stated: "John, See the revised compensation workup. I added in the 2023 and 2024 actual compensations." *Exhibit 1 at 1.*

23. The spreadsheet accompanying Ilardi's June 23, 2025 email is attached as Exhibit 2. The spreadsheet is captioned, "Carlo Ilardi – Compensation." The spreadsheet includes a series of columns showing compensation types and time periods and a series of rows showing the amount of each compensation type for each time period.

24. Key facts shown on the Exhibit 2 spreadsheet include: Ilardi's compensation under his agreement with DP included (a) a $207,600 annual salary, plus (b) a fixed year-end bonus equal to one month's additional salary ($17,300), referred to as the 13th month payment, plus (c) an annual performance bonus equal to 4% of DP's EBITA.



Exhibit B

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

25. Although the Exhibit 2 spreadsheet labeled the earning upon which the bonus was calculated as "EBITA," this was an error. Ilardi's bonus was always based on EBIT (adjusted as described above) and Ilardi and Habe in their other communications referred to the earnings measurement upon which the bonus was to be calculated as EBIT. EBITA earning would ordinarily be higher than EBIT earnings.

26. The Exhibit 2 spreadsheet that Ilardi provided to Habe at his request showed that Ilardi's bonus in 2023 was 2.5% of $3,202,773; in 2024, it was 3% of zero; and in 2025, it would be 4% of the earnings in that year.

27. In addition to showing Ilardi's current compensation for 2025 and his past compensation for 2023 and 2024, the Exhibit 2 spreadsheet also showed Ilardi's proposal for his future compensation after PMG acquired DP. Ilardi's proposal for his future compensation, shown in the light blue shaded area of Exhibit 2, included increases in his annual salary, increases in his percentage bonus rate in 2026 and 2027, and a new, annual signing bonus.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

28. Ilardi and Habe entered into negotiations about the structure and amount of Ilardi's compensation. These negotiations included numerous conversations as well as emails.

29. After Ilardi disclosed to Habe the structure and amount of his existing compensation for 2025, Habe prepared and sent to Ilardi a series of spreadsheets and charts showing different proposed compensation arrangements. Some of Habe's proposals were based on modifications to Ilardi's existing compensation as shown on Exhibit 2. Other proposals were quite different. Habe generally proposed paying Ilardi's EBIT bonus over five or six monthly installments rather than in a single lump sum payment.

30. Ilardi in turn proposed alternatives to Habe's proposals. Ilardi's proposals generally sought greater compensation for him, in part to make up the compensation he was going to lose from ending his relationship with Arch Precision. Habe had insisted, as a condition of Ilardi's remaining president of DP, that Ilardi have no outside business relationships and, specifically, that he end his relationship with Arch Precision.

31. Ultimately, Ilardi and DP did not reach an agreement on a new compensation agreement for Ilardi. Instead, on July 15, 2025, in an email

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

that was part of an email chain between Ilardi and Habe attached to this petition as Exhibit 3, Habe wrote:

> Carlo,
>
> Results are what matter to me and the rest of the ownership group. Specifically, EBIT/EBITDA for the short term and long term.
>
> Of course, EBITDA is nothing without making sure our employees are safe. Please always keep safety in mind. In your position, opportunity for advancement and increases in pay are based on the results you provide. Not before those results are achieved, but after.
>
> **Let's keep you at your current pay structure and reassess after 2025 is completed**. …

*Exhibit 3 at 4* (emphasis added).

The "current pay structure" referenced in Habe's July 15, 2025 was the pay structure described in the Exhibit 2 document that Ilardi had provided Habe.

32. In reliance on Habe's offer to continue employing Ilardi as president of DP on his current pay structure, Ilardi terminated his contract with Arch Precision in July 2025.

33. Ilardi wrote back to Habe acknowledging Habe's email and confirming his agreement with Habe's statement that pay should be based

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

on results. Ilardi requested that Habe provide him his EBIT and EBITDA goals for 2025, which Ilardi stated he had never seen. *Exhibit 3 at 3*.

34. Ilardi and Habe agreed that Ilardi's compensation for 2025 would remain unchanged from what Ilardi was being paid and was going to be paid by the prior ownership as described in Exhibit 2. This agreement was verbal and confirmed Habe's proposal to "keep you at your current pay structure" stated in Habe's July 15, 2025 email.

35. In an alternative reading, Habe's email of July 15, 2025 to Ilardi stating, "Let's keep you at your current pay structure and reassess after 2025 is completed," was a unilateral offer of a contract of employment under terms equal to Illardi's existing compensation package as described in Exhibit 2. In this alternative reading, Ilardi accepted the offer by continuing to work as president of DP.

36. Ilardi's compensation was not discussed further by Ilardi and DP until December 2025.

37. Ilardi continued to receive his agreed monthly salary for the rest of 2025. In December 2025, however, DP failed and refused to pay Ilardi's his "13th month" salary payment, stating falsely that it was a discretionary bonus rather than part of Ilardi's base compensation. DP

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

further asserted that Ilardi request for payment of the 13th month salary payment was an attempt to embezzle money from DP.

38. In 2025, DP failed and refused to make a contribution to Ilardi's executive annuity.

39. DP's EBIT was strongly positive in 2025. Nevertheless, DP failed and refused to pay Ilardi an EBIT bonus, contending falsely that the bonus was discretionary rather than contractual.

40. Ilardi fully or substantially performed his obligations under his employment contract.

41. DP materially breached its employment contract with Ilardi through its failure and refusal to pay Ilardi (a) his 13th month salary, (b) its contribution to his executive annuity, and (c) his EBIT bonus.

42. Ilardi was thereby damaged.

43. Ilardi does not know the actual amount of DP's EBIT for 2025, having been denied access to DP's end of year financial statements. However, DP's EBIT as of the end of November 2025 was $3,963,276.02. *Exhibit 4*. Based on trends in 2025, EBIT most likely increased in December 2025 and thus was higher at year's end than at the end of November.

44. Four percent of $3,963,276.02 is $158,531.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

45. Four percent of the actual year end 2025 EBIT is most likely a greater amount than $158,531.

46. The employment contract between Ilardi and DP did not include an interest rate to be applied to late wage payments under the contract.

WHEREFORE, plaintiff Ilardi requests that the court enter judgment in his favor and against DP for the following sums: (a) $17,300 for the unpaid "13th month" salary; and (b) $8,200 for the payment due to his executive annuity; and (c) an as yet unknown amount in excess of $158,531 in payment of Ilardi's contractual 4% bonus on DP's adjusted EBIT for calendar year 2025 as shown on DP's audited financial statements.

Ilardi further requests that the court grant him prejudgment interest on each of the foregoing sums at the statutory rate of 9% per year simple interest, post-judgment interest at the same rate, and such further and additional relief as to which he may be entitled.

**COUNT 2 – STATUTORY WAGE THEFT**
**(Defendants Deutsch Precision, LLC and John Habe IV)**

47. Plaintiff realleges his allegations above as though restated in full herein.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

48. This statutory wage theft count is alleged against defendants DP and Habe, jointly and severally.

49. DP was Ilardi's employer and thus directly responsible to pay Ilardi his wage.

50. Habe had such a degree of control over DP that the company served as his alter ego. Habe regularly ignored the separate existence of DP and treated it instead as a department of the PMG conglomerate, including by assigning senior management responsibilities at DP to individuals who were not DP employees but were instead employees of PMG or of some other entity in the PMG conglomerate.

51. Ilardi's 13th month salary, DP's contribution to Ilardi's annuity, and Ilardi's EBIT bonus were all part of the compensation due to Ilardi by reason of his employment by DP.

52. As such, Ilardi's 13th month salary, the contribution to his annuity, and his EBIT bonus were all part of his "wage" as defined by Section 290.500(7), RSMo.

53. Because DP did not pay Ilardi one or more of the foregoing components of his wage, Ilardi is entitled under Section 290.527, RSMo., to recover from DP (a) the amount of his unpaid wage, (b) liquidated

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

damages equal to two times the amount of his unpaid wage, and (c) his costs and reasonable attorney fees incurred in recovering his unpaid wage.

54. Under Section 290.527, an award of liquidated damages and an award of attorney fees and costs to a prevailing employee-plaintiff are mandatory and not discretionary.

55. Under Section 290.527, attorney fees to be award to a prevailing employee-plaintiff include all expenses of collection and litigation that would ordinarily be paid by a fee-paying client to their attorney in the community. This would included, but not be limited to, expert witness fees and travel expenses, so long as the expenses are sums that would typically be charged to and paid by a fee-paying client.

WHEREFORE, plaintiff Ilardi requests that the court enter judgment in his favor and against DP and Habe, jointly and severally, for the following sums: (a) $17,300 for Ilardi's unpaid "13th month" salary; (b) $8,200 for the payment DP was required to make to Ilardi's executive annuity; (c) an as yet unknown amount in excess of $158,531 for Ilardi's contractual bonus equal to 4% of DP's adjusted EBIT for 2025 as shown on DP's audited financial statements; and (d) two times the sum of each of the foregoing amounts as statutory liquidated damages under Section 290.527.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

Ilardi further requests that the court grant him prejudgment interest on the foregoing sums at the statutory rate of 9% per year simple interest.

Ilardi further requests that the court award him his costs and his reasonable attorney fees incurred in recovering his unpaid wage as provided by Section 290.527.

Ilardi further requests that the court grant him post-judgment interest on the foregoing sums at the statutory rate of 9% per year simple interest.

Ilardi finally requests that the court grant him such further and additional relief as to which he may be entitled.

**COUNT 3 – PAYMENT DUE DISCHARGED EMPLOYEE**
**(Defendant Deutsch Precision, LLC only)**

56. Plaintiff realleges his allegations above as though restated in full herein.

57. In an email dated December 30, 2025, Ilardi wrote an email reminding DP that he was owed his 13th month salary and his EBIT bonus and that if he was being terminated, he wanted to be paid the amounts he was owed. Specifically, Ilardi wrote to Habe: “It seems like you do not agree and would like to push me out. If that is the case please let

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

me know now and we can settle up and be done. I have plenty of other opportunities available."

58. In an email dated Sunday, January 4, 2026 responding to Ilardi's December 30, 2025 email, Habe directed Ilardi not to come to work Monday and Tuesday (January 5 and 6).

59. DP terminated Ilardi's employment January 6, 2026. Habe told Ilardi that his employment was terminated effective January 6 in an email dated January 10, 2026.

60. At the time DP terminated Ilardi's employment, he was earning a monthly salary of $17,300 per month.

61. At the time DP terminated Ilardi's employment, he had earned, but had not been paid, wages, including a payment of $17,300 for his 13th month salary.

62. Although Ilardi's 13th month salary was originally due in December 2025, under Section 290.110, RSMo., the full amount of the unpaid wages earned by Ilardi were due and payable in full on the date of his discharge, January 6, 2026.

63. Ilardi demanded in writing payment of the money due him for his unpaid wages.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

64. DP has not, to this day, paid Ilardi his unpaid wages.

65. As a statutory penalty under Section 290.110 for nonpayment of wages upon termination of employment, DP owes Ilardi an additional 60 days of wages totaling $34,600.

WHEREFORE, plaintiff Ilardi requests that the court enter judgment in his favor and against DP for the sums of $34,600 as a penalty for its nonpayment of 60 days of his salary wages; and grant him prejudgment interest on such sum at the statutory rate of 9% per year simple interest beginning January 6, 2026, plus post-judgment interest at the same rate, and such further and additional relief as to which he may be entitled.

**COUNT 4 – DEFAMATION**
**(All Defendants)**

66. Plaintiff realleges his allegations above as though restated in full herein.

67. This defamation count is alleged against defendants DP, Habe, and Reeder, jointly and severally. The tortious actions alleged against Habe and Reeder in this count were performed by the two men both individually and on behalf of DP as DP's officers or agents.



Exhibit B

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

68. In December 2025, Ilardi submitted to the payroll department the paperwork for payment of his 13th month salary. This was consistent with historical practice at DP and was consistent with Ilardi's employment contract, which provided for him to receive this payment.

69. Reeder prevented the payment of Ilardi's 13th month salary and reported Ilardi's submission for the payment to Habe, describing it as an attempted embezzlement by Ilardi.

70. Reeder did not ask Ilardi for an explanation of the payment request before telling Habe that Ilardi was attempted to embezzle from the company.

71. Following Reeder's report to Habe, Habe contacted Ilardi expressing the belief that Ilardi was stealing from DP and directing Ilardi not to destroy or hide any documents. Habe also demanded that Ilardi provide him with a multitude of documents and detailed reports showing the extent of his alleged theft and other unspecified misconduct against DP. *Exhibit 5.*

72. Ilardi attempted to remind Habe about their agreement to continue Ilardi's existing compensation in 2025. Habe feigned ignorance

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

of their agreement. Habe also feigned ignorance of Ilardi's compensation arrangements with DP before the change in ownership in 2025.

73. Habe met with the members of PMG board to advise them about Ilardi's alleged thefts from DP. Ilardi asked Habe for an opportunity to address the PMG board, but Habe refused his request. Based on Habe's representations, the PMG board authorized an internal investigation of Ilardi's activities.

74. As part of the internal investigation, Habe held meetings with all of the members of the DP management team in early January 2026. In these meetings, Habe told the DP managers that Ilardi had stolen from the company. Habe directed the managers to provide him with statements about all misconduct they had observed involving Ilardi.

75. Habe knew and intended that his statements to the DP managers would be repeated by them to other DP employees.

76. None of the members of the DP management team provided Habe with any statements about Ilardi's alleged misconduct, stating that they were not aware of any. Nevertheless, although the managers and the other DP employees had no knowledge of any misconduct by Ilardi, Habe's insistence, as the owner of DP, that Ilardi had stolen from the company

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

caused many DP managers and other employees to become distrustful of Ilardi and to consider him dishonest.

77. Habe's statements damaged Ilardi's reputation with his fellow DP managers and other employees, including those with whom he had worked for many years. Habe's statements about Ilardi's alleged dishonesty was viewed as credible and was effective in damaging Ilardi's reputation within the workplace because Habe, as the owner of DP, was deemed a reliable reporter of facts about DP.

78. Habe either knew that his defamatory statements about Ilardi were false or he made the statements with reckless disregard for whether they were true or false.

79. Habe's motive for knowingly spreading false and defamatory statements about Ilardi was Habe's desire to avoid paying Ilardi his substantial EBIT bonus, thereby keeping these funds in DP.

80. Habe's and PMG's purchase of DP was highly leveraged. In connection with the purchase financing, Habe's and PMG's lenders had included in the loan documents certain covenants about DP's financial condition. These covenants included DP completing calendar year 2025 with earning above specific EBIT and EBITDA levels. If DP failed to



Exhibit B

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

satisfy these covenants, then DP and Habe would be in default on their loans.

81. Paying Ilardi his full contractual wage, including in particular his EBIT bonus, would put DP and Habe at risk of default on its financing.

82. Notwithstanding Habe's insistence that Ilardi had engaged in financial misconduct against DP, including attempted embezzlement, Habe simultaneously offered Ilardi employment as an employee of another company controlled by PMG or as an employee of PMG itself.

83. Habe's offer to Ilardi of employment with PMG or with a PMG company demonstrated that Habe did not actually believe that Ilardi had attempted to embezzle funds or otherwise steal from DP.

84. Habe's job offers to Ilardi included several conditions: (a) Ilardi would have to release his claim to his EBIT bonus and his other unpaid DP wages; (b) Ilardi would have to provide Habe, PMG, DP, and others a broad general release for all liability; and (c) Ilardi would have to sign a highly-restrictive confidentiality, non-solicitation, and non-compete agreement that would prevent him from going into business or being employed by any company in competition with PMG and its affiliates.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

85. Ilardi had never had a confidentiality, a non-solicitation, or a non-compete agreement in his employment with DP, Hydromat, or Arch Precision.

86. Habe offered new jobs to Ilardi with pay and benefits less than what Ilardi had been earning at DP. Concerned about his ability to sustain himself financially without a job, Ilardi considered Habe's offer of a new position with PMG outside of DP, but pushed back on Habe's insistence that he sign the highly-restricted confidentiality, non-solicitation, and non-compete agreement that Habe proposed.

87. In response to Ilardi's objection to the proposed agreement, Habe immediately reduced the pay in the job offer and warned Ilardi that any further delay in accepting Habe's job offer and in signing the various required agreements would result in further reductions to Ilardi's pay in his new position.

88. Ilardi refused to accept employment under these terms.

89. Habe was a close friend of both Bruno Schmitter, one of the former DP owners and CEO of Hydromat, and Matthias Walter, President of Hydromat.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

90. Habe told Schmitter and Walter that Ilardi had been or was being fired as president of DP because of an attempt to steal from the company.

91. Although Schmitter and Walter had both known Ilardi for many years and had made Ilardi president of DP, Habe's defamatory statements to them about Ilardi caused Schmitter and Walter to become suspicious of Ilardi and to view him as not honest. Habe's statements to Schmitter and Walter had a strong impact on the two men because of their close relationships with Habe.

92. After he was fired, Ilardi filed for unemployment. DP opposed the unemployment claim, asserting that Ilardi was fired for cause. In an effort to support this false for-cause claim, Reeder filed one or more reports with the Maryland Heights Police Department accusing Ilardi of theft or attempted embezzlement from DP.

93. Reeder knew at the time he made the allegations to the police that his statements were false. Alternatively, Reeder made the statements to the police with reckless disregard of whether they were true or false.

94. Reeder made these false statements to the police on behalf of and as an agent of DP. Notwithstanding that he was making these state-

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

ments on behalf of his employers, Reeder is also personally liability for his tortious conduct.

95. As a result of Reeder's false and defamatory statements to the police, the Maryland Heights Police Department opened an investigation on Ilardi, contacted him, interviewed him, and engaged in additional investigatory actions directed against him.

96. Being accused of crimes and investigated by the police caused Ilardi emotional distress, including loss of sleep and fear.

97. Ilardi has not been charged with a crime, but neither has the investigation into him been closed to the best of his knowledge.

98. Sometime after Reeder made his statements to the police, and seeing no steps being taken by the police to criminally charge Ilardi, Reeder and, on information and belief, Habe followed up to push the Maryland Heights Police Department to criminally charge Ilardi.

99. Ilardi has been damaged as a result of the false and defamatory statements made by Reeder and Habe. Specifically, Ilardi's reputation has been damaged or destroyed within the community of employees of DP, many of whom had been friends of many years standing, and with Schmitter and Walter, Ilardi's longtime employers and friends.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

100. Reeder and Habe each made their statements about Ilardi within the scope of their respective agency for DP.

101. Reeder's actions in defaming Ilardi were malicious, knowing, intentional, willful, and wanton, and are outside the scope of behavior tolerable in a civilized society.

102. Habe's actions in defaming Ilardi were malicious, knowing, intentional, willful, and wanton, and are outside the scope of behavior tolerable in a civilized society.

WHEREFORE, plaintiff Ilardi requests that the court enter judgment in his favor and against Reeder and Habe for such sums as might properly compensate him for their defamation of him.

Ilardi further requests that DP be held vicariously liable for the actions of its agents, Reeder and Habe, and that any judgment entered in favor of Ilardi against either Reeder and Habe be made jointly against DP.

Ilardi further requests that the court grant him post-judgment interest on any judgment enter in his favor on his defamation claims at the statutory rate of 9% per year simple interest.

Ilardi also requests that the court grant him such further and additional relief as to which he may be entitled.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

**COUNT 5 – TORTIOUS INTERFERENCE**
**(Defendants Deutsch Precision, LLC and John Habe IV)**

103. Plaintiff realleges his allegations above as though restated in full herein.

104. This tortious interference count is alleged against defendants Habe and DP only.

105. In late December 2025, Habe knew that if he fired Ilardi, Ilardi would likely seek employment with Hydromat, the company where Ilardi had been employed before become president of DP. Habe knew that the CEO of Hydromat, Schmitter, held Ilardi in high regard and believed that if Ilardi sought employment at Hydromat, Schmitter would hire him.

106. Habe did not want Ilardi to get any employment to replace his employment at DP. Habe believed that if Ilardi could not get replacement employment, he would become desperate and would feel that he had to accept Habe's offer of employment at PMG or one of its companies and, in connect with such employment, provide the specific and general releases and the highly-restricted confidentiality, non-solicitation, and non-compete agreements that Habe had demanded from Ilardi.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

107. To prevent Ilardi from getting employment at Hydromat, and thus to increase the pressure on Ilardi to accept Habe's offer of employment, Habe told Schmitter and Walter that Ilardi had attempted to steal or embezzle from DP and that Habe was therefore in the process of firing or had already fired Ilardi.

108. Habe knew that Schmitter and Walter would believe Habe's statements because of their long, close friendship and business relationships, including having meals at each other's home, going on vacations together, and even owning businesses together.

109. In late 2025 and earlier 2026, Ilardi saw that Hydromat was seeking to hire a chief operating office ("COO"), the number two position at the company. Ilardi knew Hydromat's business well, knew the responsibilities of its COO, and knew that he was highly qualified for the position.

110. Ilardi contacted Schmitter to ask about the COO position. Schmitter was superficially friendly but evasive. Schmitter first told Ilardi that he was looking to fill the COO position with an internal candidate; he then told Ilardi that Hydromat was actually not looking to fill the position at all at the time in an effort to cut its expenses. *Exhibit 6*.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

111. Neither of Schmitter's inconsistent statements to Ilardi that (a) Hydromat was looking solely for an internal candidate to promote to be its COO and (b) Hydromat was leaving its COO position vacant were true. In fact, Hydromat was then advertising for external candidates for COO and continued to advertise for external candidates for the COO position for months after Ilardi's conversation with Schmitter. *See Exhibit 7*.

112. Ilardi had a reasonable expectation of being hired to fill the COO position at Hydromat given his long history of success at that company and at other businesses owned or run by Schmitter.

113. Ilardi was denied the opportunity to obtain employment as Hydromat COO because of Habe's false and defamatory communications to Schmitter and Walter that were intended to alienate Schmitter and Walter from Ilardi and prevent Hydromat from hiring Ilardi.

114. Ilardi was thereby damaged.

115. Habe's actions in interfering with Ilardi's opportunity to be employed by Hydromat were malicious, knowing, intentional, willful, and wanton, and are outside the scope of behavior tolerable in a civilized society.

Electronically Filed - ST LOUIS COUNTY - July 07, 2026 - 02:16 PM

WHEREFORE, plaintiff Ilardi requests that the court enter judgment in his favor and against Habe for such sum as might properly compensate him for Habe's tortious interference with Ilardi's reasonable business expectation of obtaining the COO or other senior position at Hydromat.

Ilardi further requests that the court grant him post-judgment interest on any judgment enter in his favor on his tortious interference claims at the statutory rate of 9% per year simple interest.

Ilardi also requests that the court grant him such further and additional relief as to which he may be entitled.

JACOBSON PRESS P.C.
By: /s/ Joe D. Jacobson
Joe D. Jacobson, #33715
(314) 899-9790 (tele and fax)
Bruce R. Bartlett, #42680
314-725-3939 (tele)
314-725-5595 (fax)
222 S. Central Ave., Suite 550
Clayton, MO 63105
Jacobson@ArchCityLawyers.com
Bartlett@ArchCityLawyers.com

Attorneys for plaintiff Carlo Ilardi

Exhibits 1 to 7 attached